IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

Case No. 06-3092
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

ANTHONY R. ROMERO, also known as
Victor Hugo Gonzales
Defendant-Appellant.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS AT WICHITA, KANSAS
BEFORE THE HONORABLE WESLEY E. BROWN.

Case No.  05-10080-01
_____

<u>BRIEF FOR THE APPELLANT</u>

ORAL ARGUMENT IS REQUESTED
_____

Respectfully submitted,

_____
JOHN K. HENDERSON, JR.
<u>s/John K. Henderson, Jr.    </u>
JOHN K. HENDERSON, JR.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org

**THIS BRIEF INCLUDES ATTACHMENTS SUBMITTED SEPARATELY IN DIGITAL FORM**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v-1

RELATED APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ISSUE PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

     I.    ASSUMING MR. ROMERO GAVE CONSENT TO SEARCH HIS CLOSET WHICH CONTAINED THE COCAINE, WAS THE CONSENT VOLUNTARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     II.    ASSUMING MR. ROMERO GAVE CONSENT TO SEARCH HIS CLOSET WHICH CONTAINED THE COCAINE, DID LAW ENFORCEMENT EXCEED THE SCOPE OF THE CONSENT. . . . . 2

     III.    DID MR. ROMERO GIVE CONSENT TO SEARCH THE CLOSET WHICH CONTAINED THE COCAINE. . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

STATEMENT OF THE CASE AND FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . .3-8

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8-19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . .19

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

CERTIFICATE OF DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . .22

APPENDICES

     1.    Superseding Indictment.

2.     Sentencing Order.

3.     Notice of Appeal.

4.     Motion for Extension of Time to File Appellant's Brief.

5.     Order granting Motion for Extension of Time.

6.     Second Motion for Extension of Time to File Appellant's Brief.

7.     Order granting Second Motion for Extension of Time.

## TABLE OF AUTHORITIES

## CASES

Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788 (1968). . . . . . . . . . . . . .9

Florida v. Jimeno, 500 U.S. 248, 111 S.Ct. 1801 (1991). . . . . . . . . . . . . . . . . 18

Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371 (1980). . . . . . . . . . . . . . . . 8

Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041 (1973). . . . . . . . . . . . 9

United States v. Anderson, 114 F.3d 1059 (10th Cir. 1997). . . . . . . . . . . . . . . . 18

United States v. Briley, 726 F.2d 1301 (8th Cir. 1984). . . . . . . . . . . . . . . . . . . 16

United States v. Carter, 884 F.2d 368 (8th Cir. 1989). . . . . . . . . . . . . . . . . . . .16

United States v. Contreras, 372 F.3d 974 (8th Cir. 2004). . . . . . . . . . . . . . . . . .16

United States v. Hernandez, 93 F. 3d 1493 (10th Cir. 1996). . . . . . . . . . . . . . . .16

United States v. Price, 925 F.2d 1268 (10th Cir. 1991). . . . . . . . . . . . . . . . . . .9

United States v. Shields, 573 F.2d 18 (10th Cir. 1978). . . . . . . . . . . . . . . . . . .15

United States v. Soto, 988 F.2d 1548 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . 9

United States v. West, 219 F.3d 1171 (10th Cir. 2000). . . . . . . . . . . . . . . . . . .8, 9

## STATUTES

28 U.S.C. 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9, 19

UNITED STATES OF AMERICA,     }
    Plaintiff-Appellee,       }
                                    }
vs.                                   }
                                   } Case No.  06-3092
                                   }
ANTHONY R. ROMERO, also known as  }
Victor Hugo Gonzales,       }
    Defendant-Appellant.      }
_____}

## RULE 46.1.3 CERTIFICATION

      Pursuant to Rule 46.1.3 of the Rules of Court, United States Court of Appeals for the Tenth Circuit, the undersigned certifies that the following parties or attorneys are now, or have been, interested in this litigation or any related proceedings.  These representations are made to enable judges of the Court to evaluate the possible need for disqualification or recusal:

      Honorable Wesley E. Brown, U.S. District Court Judge

      John K. Henderson, Jr., Assistant Federal Public Defender
           Counsel for Defendant-Appellant.

      David J. Phillips, Federal Public Defender

      Anthony R. Romero, also known as Victor Hugo Gonzales, Defendant-Appellant

      Eric F. Melgren, United States Attorney

      Brent I. Anderson, Assistant U.S. Attorney

v

Respectfully submitted,

_____
JOHN K. HENDERSON, JR.


s/John K. Henderson, Jr._____
JOHN K. HENDERSON, JR.
        Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org


## **RELATED APPEALS**

Appellant respectfully informs this Court that no other appeals regarding this

Appellant have been filed, docketed or heard.


## **JURISDICTION**

Appellant herein has appealed, pursuant to 28 U.S.C. 1291 and Fed. R. App.

P. 4(b)(1), from the Judgment order filed and entered in the above-captioned case

on March 2, 2006.  A notice of appeal was filed on March 8, 2006.

## ISSUES PRESENTED FOR REVIEW

I.    **ASSUMING MR. ROMERO GAVE CONSENT TO SEARCH HIS CLOSET WHICH CONTAINED THE COCAINE, WAS THE CONSENT VOLUNTARY**

II.    **ASSUMING MR. ROMERO GAVE CONSENT TO SEARCH HIS CLOSET WHICH CONTAINED THE COCAINE, DID LAW ENFORCEMENT EXCEED THE SCOPE OF THE CONSENT**

III.    **DID MR. ROMERO GIVE CONSENT TO SEARCH THE CLOSET WHICH CONTAINED THE COCAINE**

## SUMMARY OF ARGUMENT

Mr. Romero did not give the officers consent to search his closet which contained the cocaine. Mr. Romero respectfully submits that the District Court's finding that consent was given was clearly erroneous. If this Court affirms the District Court's findings, the consent was not voluntary. Mr. Romero was in custody, the officers repeatedly requested that he give consent, there was a communication barrier, he had been drinking most of the day, and the officers used trickery - searching the house for drugs under the ruse of looking for identification when they already knew the identity of Mr. Romero. Finally, if this court finds consent was given and the consent was voluntary, then the search exceeded the scope of the search. First, the search should have ended once law enforcement became aware of Mr. Romero's identity or had a means of verifying the identity which did not entail a warrantless search. Second, searching for Mr. Romero's identification did not include searching through a white plastic shopping bag hidden between neatly

2

folded shirts.

## STATEMENT OF THE CASE AND FACTS

On September 21, 2005, Mr. Romero was charged by way of Superseding Indictment with three counts.  Count One charged possession with intent to distribute 427 grams of marijuana on December 12, 2003.  Count Two charged possession with intent to distribute 5,235 grams of marijuana on June 17, 2004.  Count Three charged possession with intent to distribute 50 grams of cocaine base on April 10, 2005.  (R.O.A. Vol. I, No. 16).

This appeal  is limited to a review of the District Court's decision denying the defendant's Motion to Suppress the search on April 10, 2005, related to Count Three. On September 22, 2005, the District Court heard evidence on the defendant's Motion to Suppress the search of Mr. Romero's home on April 10, 2005.  (R.O.A. Vol. II).  On October 20, 2005, the District Court issued a Memorandum and Order denying the defendant's Motion to Suppress (R.O.A. Vol. I, No. 25).  The case went to trial on December 6, 2005 and on December 9, 2005 the jury returned a verdict of guilty on all three counts.  The District Court sentenced Mr. Romero to a term of 160 months in prison. (R.O.A. Vol. I, No. 48).

At sometime near but after midnight on April 10, 2005, the police responded to a call from a neighbor that there was a domestic disturbance at 1802 Madison in Wichita, Kansas.  (R.O.A. Vol. II, p 34 and Vol. III, No. 60, p. 37).  Mr. Romero had his personal belongings in a closet in the house at that address.  (R.O.A. Vol. II, pp.

61-63).

Sgt. Espinoza of the Wichita Police Department was one of at least 5 officers who responded to the domestic disturbance call. (R.O.A. Vol. II, p. 40). At the time Sgt. Espinoza was at the scene of the domestic disturbance, he saw someone running down an adjoining street. (R.O.A. Vol. II, p. 46 and 57). Sgt. Espinoza got into his patrol car and followed the person who hid behind some bushes. (R.O.A. Vol. II, p. 57). Sgt. Espinoza got out of the patrol car, drew his pistol, and ordered the person to come out from behind the bushes. (R.O.A. Vol. II, p. 57-58). The person was Anthony Romero (R.O.A. Vol. II, p. 8). Sgt. Espinoza ordered Mr. Romero to sit on the curb. (R.O.A. Vol. II, p. 58).

At the time Sgt. Espinoza first met Mr. Romero and had him sit on the curb, Sgt. Espinoza had difficulty communicating with Mr. Romero and contacted the police dispatch to send a Spanish-speaking interpreter. (R.O.A. Vol. II, p. 72-73). Sgt. Espinoza admitted that he had communication problems with Mr. Romero during the hearing on the Motion to Suppress on September 22, 2005. Id. Sgt. Espinoza also testified at the suppression hearing that he called an interpreter to assist in communicating with Mr. Romero. (R.O.A. Vol. II, pp. 72-73). At the time of the trial, on December 6, 2005, Sgt. Espinoza denied that he had difficulty communicating with Mr. Romero and denied that he called an interpreter to assist in communicating with Mr. Romero. (R.O.A. Vol. III, No. 60, pp. 51-53). When a second officer, Officer Boone, arrived, Sgt. Espinoza left Mr. Romero and returned

to 1802 Madison.  (R.O.A. Vol. II, p. 58).

Officer Boone attempted to identify Mr. Romero three times while they were at the curb.  (R.O.A. Vol. II, p 10-11).  Mr. Romero gave the names Juan and Jose Gonzales. Id.

Officer Boone placed Mr. Romero in his squad car and took him to 1802 Madison.  (R.O.A. Vol. II, p. 22-23).  Mr. Romero was in custody - he never had the option to leave. (R.O.A. Vol. II, p. 24).   Officer Boone placed Mr. Romero in handcuffs  at 1802 Madison.  (R.O.A. Vol. II, p. 29-30).  Mr. Romero was in custody in handcuffs in the back of a patrol vehicle at the time Sgt. Espinoza allegedly requested consent to search Mr. Romero's closet.  (R.O.A. Vol. II, p. 29-30).

 Ms. Montoya opened the door of the house at 1802 Madison to four officers. (R.O.A. Vol. II, p. 41 and 59).  At that time the officers went through the house, looking into areas where a person might be hiding, including rooms and closets. (R.O.A. Vol. II, p. 41-43).   At the time the officers were searching the house, Ms. Montoya identified her boyfriend as Anthony Romero and described his physical appearance. (R.O.A.  Vol. II, pp. 61).   Believing that the person Ms. Montoya described might be the same person Sgt. Espinoza found in the bushes, Sgt. Espinoza directed that Officer Boone bring Mr. Romero to 1802 Madison.  (R.O.A. Vol. II, pp. 22-24 and 38-39).  Officer Boone brought Mr. Romero to 1802 Madison. Id.  At that time, an officer brought Ms. Montoya to the car and she identified Mr. Romero as her boyfriend and told the officers a second time that his name was

Anthony Romero.  (R.O.A. Vol. II, pp.  80, 22-24 and 39-40).

The first time Ms. Montoya told Sgt. Espinoza the name of her boyfriend was Anthony Romero, Sgt. Espinoza recognized the name as the name of a person he knew as someone involved with drugs. (R.O.A. Vol. II, pp. 51and 61). Sgt. Espinoza immediately began to work on Ms. Montoya to authorize a search of the house, particularly the closet where Mr. Romero kept his personal belongings.  (R.O.A. Vol. II, pp. 51, 61 and 78-79).  Ms. Montoya insisted that the closet belonged to Mr. Romero and that the officers needed Mr. Romero's consent before they could search his closet. (R.O.A. Vol. II, pp. 76-79, 83-84, 51-52, and 61-62).

In response, Sgt. Espinoza asked Mr. Romero for consent to search for identification. (R.O.A. Vol. II, pp. 52 and 62).  Mr. Romero testified that he did not give consent to search the closet. (R.O.A. Vol. II, pp. 85-87).  Sgt. Espinoza testified that Mr. Romero gave permission to search the closet. (R.O.A. Vol. II, pp.  62-63 and 52).  One of the two other  officers who appeared at the hearing testified that Mr. Romero did give permission to search the closet. (R.O.A. Vol. II, pp. 17, 28-32).  The second officer testified that  Ms. Montoya gave permission to search the closet and did not require Mr. Romero's permission. (R.O.A. Vol. II, p. 36).

Sgt. Espinoza admitted that he used trickery to persuade Mr. Romero to give consent to search the closet. (R.O.A. Vol. II, p. 62).  He knew Anthony Romero. (R.O.A. Vol. II, p. 61 and 65-66).  He knew the person Ms. Montoya identified as Mr. Romero was in fact Anthony Romero. Id.  That fact was confirmed at the police

station by Officer Boone who compared Mr. Romero to a mug shot of Anthony Romero. (R.O.A. Vol. II, p 65-66). Sgt. Espinoza wanted to search the house, particularly the closet, for drugs. Id. Even though he knew Mr. Romero was Mr. Romero, he lied and told Mr. Romero that the reason for the request and the basis for the consent was to search for identification to establish the identity of Mr. Romero. (R.O.A. Vol. II, pp 62-67).

Sgt. Espinoza searched Mr. Romero's closet for drugs. (R.O.A. Vol. II, pp. 53-54 and 67-68). Beneath neatly folded shirts, he saw a plastic bag. Id. The bag was a white plastic bag that was not transparent. Id. Sgt. Espinoza unwrapped the bag, looked inside, and found a second bag which was clear. Id. Inside the second bag, he found crack cocaine. Id. Initially, under direct testimony, Sgt. Espinoza testified that the plastic baggie he saw under clothes was clear and that he saw the crack cocaine in the baggie as he lifted the clothes. (R.O.A. Vol. II, pp. 53-54 and 67). Then, on cross-examination, Sgt. Espinoza testified that the bag under the clothes was not clear - it was white and you could not see what was inside. (R.O.A. Vol. II, pp. 67-68). The District Court found that "[t]he bag was big enough that it could have contained a wallet, receipt, bill or other item of identification." (R.O.A. Vol. I, No. 25, p. 4). Sgt. Espinoza never testified that he looked inside the bag to search for a wallet, receipt, bill or other item of identification. (R.O.A. Vol. II, pp. 53-54 and 67-68). He testified initially that he could see the crack cocaine through the bag. (R.O.A. Vol. II, pp. 53-54). He then changed his testimony and admitted that he

7

could not see through the bag; that he simply opened it up and found the second bag.  (R.O.A. Vol. II, p. 68.)

Ms. Montoya testified that Mr. Romero had been drinking heavily that evening.  (R.O.A. Vol. II, pp. 74-76).  That was the reason they got into a fight.  (R.O.A. Vol. II, p. 75).  All the officers testified that there was no indication of intoxication.  (R.O.A. Vol. II, pp. 13, 35 and 47-48).

## ARGUMENTS AND AUTHORITIES

### I.    Standard of Review

The Circuit Court will review de novo questions of law related to a search under the Fourth Amendment to the United States Constitution.  United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000).  Questions of fact will be reviewed under the clear error standard, considering the evidence in a light most favorable to upholding the ruling of the District Court.  Id.

### II.    Argument

The Fourth Amendment to the United States Constitution provides, in part, that "the right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. Amend. IV.  Physically entering a house has always held a special place in the application of the Fourth Amendment.  See, Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371 (1980) (Entry of a house is the primary focus of the Fourth

Amendment).  Indeed, entering a house without a warrant is per se unreasonable. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041 (1973).

Consent is one exception to entering a house without a warrant.  United States v. Price, 925 F.2d 1268, 1270-1271 (10th Cir. 1991).  The consent must be voluntary. Id.  Voluntary means there was no coercion, either express or implied.  Id. Voluntary means that the consent was unequivocal and specific.  Id.  Voluntary means the consent was given freely and intelligently.  Id

The government has the burden of proof by a preponderance of the evidence to prove the consent was voluntary.  United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1998).  Simple acquiescence to a showing of lawful authority is not enough to satisfy this burden.  Bumper v. North Carolina, 391 U.S. 543, 549, 88 S.Ct. 1788 (1968).

### A.  Mr. Romero Did Not Consent to the Search

The District Court found that Mr. Romero did consent to the search.  (R.O.A. Vol I No. 60 p. 6 n 1).  The District Court's factual finding will not be disturbed unless it is clearly erroneous.  United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). The finding is clearly erroneous in this case because the District Court relied upon Sgt. Espinoza's credibility to reach this decision and Sgt. Espinoza's credibility was suspect. On two occasions, he was untruthful to the Court.  First, at the time of the suppression hearing, Sgt. Espinoza unequivocally asserted on direct testimony that when he was searching through Mr. Romero's closet he lifted up the clothes and saw

9

a clear plastic baggie sitting there on the clothes and that he could see the crack

cocaine through the clear plastic as it sat on the clothes.

Q.  Was there in fact a search of that closet?

A.  Yes, there was.

Q.  And can you tell us what was located and where?

A.  Yes.  In the top shelf in a closet there was a clear baggie with what -
- as I lifted some clothes up I saw this baggie with an off-white
substance in it.

Q. Did you identify that based on your training and experience?

A. Yes.

Q. What did you identify it as?

A.  Rock cocaine.   . . .

Q. So you continued to look for the identification documents after you
observed the clear bag just sitting there?

A.  Yes.

Q. Now if I understand it, this baggie was covered by some clothing?

A.  Yes.  I had to move several items of clothing that were folded neatly
in a closet.  There was also cowboy boots, shoes, painting clothes as
well.

Q. Was it inside any other container; that would be this plastic bag?

A. No.

Q.  So what you are doing, you were moving clothing looking for
identification and finding the bag?

A.  Yes.

(R.O.A. Vol. II. pp. 53-54).

Sgt. Espinoza described the search in such a way as to indicate that the cocaine was in plain view as he lifted up the clothing.  Yet, under cross examination, he admitted that, in fact, the cocaine was not in plain view.  It was wrapped in a second plastic bag - like a Wal-Mart shopping bag that was not clear - that was white - and a person could not see what was inside.

> Q. And where did you start looking?
>
> A.  The very top.
>
> Q. So you started on the shelf where the folded clothes were?
>
> A. Yes.
>
> Q. And you took all the clothes down off of the shelf?
>
> A.  No.  I just basically go through each set of clothes, feeling each clothing to make sure maybe there's nothing, maybe there's and ID stuck in a shirt.  I wanted to feel that.  I didn't want to unfold everything. I want to keep peoples things as nice as we can, but I go through each individual's pants.
> . . .
> Q. So you went through the closet and feeling around the closet and you come across a white bag?
>
> A. Clear bag.  There was some white on the outside, yes.
>
> Q. Well -
>
> A. It was a white bag.  Inside of the white bag was a clear bag. . . .
>
> Q. It's like a shopping bag you get at Wal-Mart?
>
> A. Yes.

11

Q. And it's white.

A. Yes. . . .

Q. An it has handles at the top that you hold onto if you have got stuff in it and you are carrying it around?

A.  That is correct.

Q.  But its white and you can't see through it?

A.  That is correct.

Q. You open it up?

A. Yes.

Q. And inside you find a clear plastic bag?

A. Yes.

Q. And you determine or you believe that that clear plastic bag inside the white bag could be cocaine?

A. Contains a substance I believe is cocaine, yes.

(R.O. A. Vol. II, pp. 65-68).

Under direct examination, Sgt. Espinoza testified that he found a clear plastic baggie and he saw the cocaine in plain view.  Under cross examination, he found a white non-transparent plastic shopping bag, opened that bag, and inside found a clear plastic baggie with cocaine.  Two very different stories.

Sgt. Espinoza told two different stories again.  During the suppression hearing, he testified that there was a communication barrier between him and Mr. Romero and that he called for an interpreter to help communicate with Mr. Romero.

Q. Detective Espinoza, you indicated in your report that when you first encountered Mr. Romero on Ash Street, you thought there were "barrier problems" while speaking to the individual and then you go to say, "as well as the victim" and then there's a big blank, "Spanish." What were the barrier problems?

A.  Well, the most important one was the one at the residence.  I believe the information was Hispanic female or I was concerned that the officers who were trying to make contact with the residents inside when we first arrived did not speak English  and I felt they didn't understand.  We wanted them to know it was police; we wanted to come in or even might be someone injured inside.  What's why I had a Spanish speaking officer to arrive at the scene to make sure we were covering all the bases.

Q.  All right now, feel free to refer to your report here.

A.  You bet.

Q.  In your report you say there that you asked Dispatch, I think it's No. 151?

A.  Yes.

Q.  Now, when you asked Dispatch to send a Spanish speaking officer, you were with Mr. Romero on Ash Street after having pulled him out of the bushes at gun point?

A.  Yes.

Q. And you are having difficulty communicating with him?

A. Yes.

Q. You think he might only speak Spanish?

A. Either that or his English was not very good.

Q.  Or he was drunk.

A. No.  I wouldn't need a Spanish speaker to talk to a guy that was

drunk.

(R.O.A. Vol. II, pp. 72-73).

Yet, during the trial, Sgt. Espinoza changed his testimony and testified that he never

had any communication barriers or problems with Mr. Romero.

> Q. When you first encountered Mr. Romero in the bushes you say you
> had your gun drawn?
>
> A.  Yes.
>
> Q.  And he came out of the bushes and you tried to talk to him.
>
> A.  I talked with him.
>
> Q. Right.  But you had some difficulty talking to him, right.
>
> A.  I don't recall that, no.
>
> Q. Well, you called an interpreter, didn't you?
>
> A.  Yes, I did.
>
> Q.  And that's because you were having difficulty communicating with
> him?
>
> A. No.

(R.O.A. Vol. II, pp. 51-52).

Only after impeaching Sgt. Espinoza with his testimony from the suppression

hearing did Sgt. Espinoza finally admit that he had difficulty communicating with Mr.

Romero.  Even then he hedged his answer by stating he only had difficulty "at first."

(R.O.A. Vol. III, No. 60, pp. 52-54).

> Sgt. Espinoza's credibility was questionable and the defendant respectfully

submits that it was clear error to find that Mr. Romero gave his consent to search the closet based upon Sgt. Espinoza's credibility. Mr. Romero testified that he did not give consent to search the closet. (R.O.A. Vol. II, pp. 85-87). There is no logical reason to believe that he would if it contained cocaine.

There was no reason presented in the facts why Sgt. Espinoza could not have presented a consent to search form to Mr. Romero to document any consent or record the conversation where he claims he obtained consent. As a matter of policy, law enforcement should be held to a higher burden of verification or documentation when obtaining consent to search a home. If they claim consent, and it is disputed, the defendant should receive the benefit of the doubt unless there is some reason why the consent was not documented or recorded.

### B. Any Consent Was Not Voluntary

Mr. Romero was in custody from the time Sgt. Espinoza drew his gun on Mr. Romero and directed him to come out from behind the bushes. A claim that his consent was voluntary must be considered with caution and misgivings if the consent is obtained after his arrest. United States v. Shields, 573 F.2d 18 (10th Cir. 1978). Mr. Romero had a gun pointed at him, was ordered to sit on the street curb, placed in the back seat of a patrol car, taken to the street in front of his home, handcuffed with his hands and arms behind him as he sat in the back seat of the car, interrogated repeatedly about his identity, confronted by his girlfriend who identified him, repeatedly asked to consent to search his home for identification, and then

driven to the police station. (R.O.A. Vol. II).  While there is no evidence Mr. Romero was physically beaten or psychologically abused, the context in which the alleged consent occurred is highly suspect.

In addition, there was a communication barrier.  Sgt. Espinoza grudgingly admitted that there was a communication barrier.  (R.O.A. Vol. II, pp. 72-73 and Vol. III, No. 60, pp. 51-54).  Sgt. Espinoza thought it was a language barrier. Id. However, Ms. Montoya stated that Mr. Romero had been drinking heavily which led to the fight.  (R.O.A. Vol. II, pp. 74-75).  This barrier is a factor which must also be considered in evaluating the voluntariness of the consent. United States v. Contreras, 372 F.3d 974, 977 (8th Cir. 2004).

Trickery is not consistent with voluntary consent.  Deception and trickery are factors which must be considered in evaluating whether the consent was voluntary. United States v. Hernandez, 93 F. 3d 1493, 1500 (10th Cir. 1996).  An officer's deceit regarding the purpose of the search can render the consent involuntary.  United States v. Carter, 884 F.2d 368, 375 (8th Cir. 1989).  Indeed, misrepresentation of the nature of an investigation may be evidence of coercion.  United States v. Briley, 726 F.2d 1301, 1304 (8th Cir. 1984).

Sgt. Espinoza admitted that he knew Mr. Romero. (R.O.A. Vol. II, p. 61 and 65-66).  In fact, it was because he knew who Mr. Romero was and that he lived in the house that Sgt. Espinoza wanted to search the house, particularly Mr. Romero's closet, for drugs. (R.O.A. Vol. II, pp. 51 and 65-66).  Furthermore, once Ms. Montoya

16

identified Mr. Romero, before the search, Officer Boone formally arrested Mr. Romero based upon his outstanding warrants and placed him in handcuffs. (R.O.A. Vol. II, pp. 29-30).

Despite the plain fact that the officers knew who Mr. Romero was, Sgt. Espinoza told Mr. Romero that he needed consent to look for identification to establish Mr. Romero's identity. (R.O.A. Vol. II, pp. 62 and 52). Sgt. Espinoza admitted that he tricked Mr. Romero to look for drugs without his knowledge. (R.O.A. Vol. II, p. 62).

The combination of all these factors weigh heavily against a conclusion that the consent was voluntary. Mr. Romero had been in custody since he was arrested at gunpoint behind the bushes. He was sitting in the back seat of a patrol vehicle surrounded by at least 4 police officers with his hand and arms pinned behind him with handcuffs. There was a communication barrier of some kind exacerbated by the frequent badgering for information about his identity and consent. Finally, Sgt. Espinoza deceived Mr. Romero by stating he only wanted to look for Mr. Romero's identification. All combined, the consent is not, as a matter of law, a voluntary consent.

### C. The Search Went Beyond the Scope of Any Consent

Sgt. Espinoza asked for consent to find proof of Mr. Romero's identification - his name or picture. That was the scope of the request and consequently the scope of the consent. The measure of the scope of any consent is objective

reasonableness - what would the typical person understand by the conversation with the officer.  <u>Florida v. Jimeno</u>, 500 U.S. 248, 111 S.Ct. 1801 (1991).   Any search pursuant to the consent is necessarily limited by the breadth of the consent.  <u>United States v. Anderson</u>, 114 F.3d 1059, 1065 (10th Cir. 1997).

Any consent given by Mr. Romero was limited to looking for his identification. First, once the officers knew Mr. Romero's identification, there was no longer any justification for continuing the search and it should have stopped.  A reasonable person in giving consent to search for his identification would expect that search to end once his identification was established.  Sgt. Espinoza knew Mr. Romero's identification before he searched the closet.  Therefore, the consent was no longer valid.

Second, while Sgt. Espinoza may have been authorized under the law to look in containers which might reasonably contain identification (assuming looking for identification was a genuine objective), it is unreasonable to expect to find identification in or among clothing which had obviously been washed, folded, and neatly stacked on the shelf.  Identification might be found in recently worn clothing hanging on a door knob or in a pile on the floor.  But, it is not reasonable to expect identification to be found in clothing neatly folded on a shelf.  Moreover, it is also unreasonable to expect to find a form of identification in  a wrapped white plastic bag stuck in the middle of a stack of neatly folded shirts.  It is reasonable to expect that a person placed a white folded bag on a shelf between neatly folded clothing to

18

conceal the item.  It is not something that a person would want the police to examine in the course of searching for identification.  Once Sgt. Espinoza found the white bag,  he should have obtained separate consent from Mr. Romero to open the bag and inspect the inside or obtained a search warrant.  Removing the bag from the closet and opening the bag to look inside exceeded the scope of the search and was unreasonable.

## CONCLUSION

The warrantless search of Mr. Romero's closet violated the Fourth Amendment to the United States Constitution.  He did not give consent.  If, however, this Court upholds the District Court's finding that Mr. Romero did give consent , the consent was not voluntary and the search went beyond the scope of the consent.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Romero respectfully requests oral argument.

Respectfully submitted,

_____
JOHN K. HENDERSON, JR.

s/John K. Henderson, Jr._____
JOHN K. HENDERSON, JR.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org.

19

## <u>CERTIFICATE OF COMPLIANCE</u>

**Section 1.  Word Count**

As required by Fed.R.App.P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains <u>5504</u> words.

**Complete one of the following:**

⊠I relied on my word processor to obtain the count and it is: <u>Corel WordPerfect 12</u>.

☐ I counted five characters per word, counting all characters including citations and numerals.

**Section 2.  Line Count**

My brief was prepared in a monospaced typeface and contains <u>798</u> lines of text.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

<div style="margin-left: 40%;">

_____
JOHN K. HENDERSON, JR.

<u>s/John K. Henderson, Jr.      </u>
John K. Henderson, Jr.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Brief of the Appellant was duly mailed (Federal Express) and an electronic submission provided in digital format was sent via e-mail to the following on this 25th day of August, 2006, to:

Original and 7 copies and email submission to:

      Ms. Elisabeth Shumaker
      Clerk of the Court
      Tenth Circuit Court of Appeals
      1823 Stout Street
      The Byron White U.S. Courthouse
      Denver, Co  80257

two copies hand delivered and email copy to:
      Brent I. Anderson
      Assistant U.S. Attorney
      301 N. Main, Suite 1200
      Wichita, KS  67202

one copy mailed to:
      Anthony R. Romero, Reg. No. 19267-031
      c/o FCI OAKDALE
      Federal Correctional Institution
      P.O. Box 5000
      Oakdale, LA 71463

                  _____
                  JOHN K. HENDERSON, JR.
                  s/John K. Henderson, Jr._____
                  JOHN K. HENDERSON, JR.
                  Sup. Ct. No. 19022
                  Assistant Federal Public Defender
                  Federal Public Defender Office
                  301 N. Main, Suite 850
                  Wichita, KS 67202
                  Telephone: (316) 269-6445
                  Fax: (316) 269-6175
                  E-mail: John_Henderson@fd.org

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I certify the following:

1.  All required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk, and

2.  The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec AntiVirus Corporate Edition, Program Versions 8.1.0.825, updated 1/23/2006 rev.6, and, according to the program, are free of viruses.

_____
JOHN K. HENDERSON, JR.


s/John K. Henderson, Jr._____
JOHN K. HENDERSON, JR.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org