IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

Case No. 06-3092

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

ANTHONY R. ROMERO, also known as
Victor Hugo Gonzales
Defendant-Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS AT WICHITA, KANSAS
BEFORE THE HONORABLE WESLEY E. BROWN.

Case No. 05-10080-01

---

REPLY BRIEF OF APPELLANT

ORAL ARGUMENT IS REQUESTED

---

Respectfully submitted,

JOHN K. HENDERSON, JR.
s/John K. Henderson, Jr.
JOHN K. HENDERSON, JR.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org

**THIS BRIEF INCLUDES ATTACHMENTS SUBMITTED SEPARATELY IN DIGITAL FORM**

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

RESPONSE TO APPELLEE'S ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . .1-11

CONCLUSION . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

CERTIFICATE OF DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

# TABLE TO AUTHORITIES

## CASES

United States v. Elliott, 107 F.3d 810 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Pena, 143 F.3d 1363 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Sawyer, 441 F.3d 890 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . .5, 8

# REPLY BRIEF

Comes now, Anthony R. Romero, a.k.a. Victor Hugo Gonzales, Appellant-Defendant, by and through his attorney, John K. Henderson, Jr., Assistant Federal Public Defender for the District of Kansas, and files this Reply to the Brief of the United States, appellee in this matter. By limiting this reply to the arguments addressed below, appellant does not abandon those arguments previously made, nor concede any of the government's arguments that are not addressed.

## I. Mr. Romero Did Not Consent

The District Court found that Mr. Romero told Sgt. Espinoza it was okay to search the closet which contained the bag of cocaine wrapped in a second white shopping bag. (R.O.A. Vol. I, No. 60, pp. 3 and 6 n.1). The District Court based this finding upon the credibility of Sgt. Espinoza. (R.O.A. Vol. I, No. 60, p.6 n. 1).[1]

The Government defends Sgt. Espinoza's credibility by characterizing the inconsistencies in his testimony as "simply an innocent misrecollection." (Appellee Br. at p.13). Even this favorable spin of the facts apparently concedes that Sgt. Espinoza's testimony was conflicted.

Sgt. Espinoza testified on direct that he saw cocaine in a clear bag when rummaging through Mr. Romero's neatly folded shirts stacked on his closet shelf. (R.O.A. Vol. II, pp. 53-54 and 67). When confronted on cross-examination with the

[1] The video and transcript of Mr. Romero's August 2, 2005, statement referenced in footnote 1 are attached as Appendices 1 and 2.

fact that the bag he first saw was white, not clear, Sgt. Espinoza changed his testimony and admitted the truth - that he could not see cocaine through a clear bag as he went through Mr. Romero's folded shirts. (R.O.A. Vol. II, p 68). Contrary to his testimony on direct, he testified that he saw a white bag, could not see through the white bag, opened the white bag and discovered a clear bag inside the white bag. Id. This is a very different story from his direct testimony which appears to be more than "innocent misrecollection." The first story on direct appeared to be deliberately calculated to convey to the Court that once the shirts were removed, the cocaine was in plain view through the transparent clear plastic bag. Sgt. Espinoza misrepresented the facts regarding what he saw to the Court on direct examination.

The Government defends Sgt. Espinoza's second "innocent misrecollection" regarding his difficulty in communicating with Mr. Romero by taking the position that the record does not support the Defendant's statement of the fact that Sgt. Espinoza called for an interpreter to communicate with Mr. Romero. (Appellee Br. at p.14). The Government cites to pages 70 and 72 of the suppression hearing transcript for their position that Sgt. Espinoza called the interpreter to interpret at the house to gain access to the house, not to help communicate with Mr. Romero. Id. Yet under cross examination, at pages 72 and 73, Sgt. Espinoza testified to the contrary:

Q. All right now, feel free to refer to your report here.

A. You bet.

Q. In your report you say there that you asked Dispatch, I think it's

No. 151?

A. Yes.

Q. Now, when you asked Dispatch to send a Spanish speaking officer, you were with Mr. Romero on Ash Street after having pulled him out of the bushes at gun point?

A. Yes.

Q. And you are having difficulty communicating with him?

A. Yes.

Q. You think he might only speak Spanish?

A. Either that or his English was not very good.

Q. Or he was drunk.

A. No. I wouldn't need a Spanish speaker to talk to a guy that was drunk.

Q. Thank you.

(R.O.A. Vol. II, pp. 72-73).

Contrary to the Government's description of the record, the record clearly establishes that Sgt. Espinoza called an interpreter to help communicate with Mr. Romero. It is noteworthy that Sgt. Espinoza did not call for the interpreter when he was at the house several blocks away trying to gain access to the house; he called for the interpreter when he had Mr. Romero at gunpoint beside the road at a different location and was trying to communicate with Mr. Romero - no one else.

Moreover, this testimony by Sgt. Espinoza was in direct conflict with his later testimony before the jury and the Court where Sgt. Espinoza **denied** that he was having difficulty communicating with Mr. Romero. (R.O.A. Vol. II, pp. 51-52).

Even calling the conflicts "innocent misrecollections" does not change the fact that in providing two critical pieces of testimony, Sgt. Espinoza was not truthful. The District Court's reliance upon Sgt. Espinoza's credibility was clearly erroneous.

On the other hand, Mr. Romero consistently asserted that he did not provide consent to search the closet. On August 2, 2005, Mr. Romero was arrested for another matter. At that time, during the first part of the interrogation, the interviewing officer took the occasion to try to obtain admissions regarding the events which occurred at Mr. Romero's home on April 10, 2005, which are the subject of this appeal. The exchange is enlightening. In response to the officer's questions, Mr. Romero adamantly denies that he gave consent. While Mr. Romero later acquiesces with the officer to the point of saying he is not sure, he does so only in response to repeatedly insistent questioning by the officer where the officer clearly indicates the answer he wants to hear. The purest and most genuine response was Mr. Romero's strong, almost visceral, reaction to the officer's first suggestion that Mr. Romero gave consent - it didn't happen. (Aplt. App. #1).

Since the witness, upon whose credibility the District Court relied to find there was consent, was not a credible witness, the District Court's finding that Mr. Romero gave consent was clearly erroneous.

The Government objects to the Defendant's public policy argument that if the Government claims consent was given and it is disputed, the defendant should receive the benefit of the doubt unless there is some reason why the consent was not documented or recorded. This argument was not raised before the District Court and the Defendant has not found prior case decisions to support the argument. Nevertheless, in this case, the arresting officer admitted that he had difficulty communicating with the Defendant and the testimony upon which the Court based its finding was provided by the same officer whose credibility was impeached on two separate occasions. The officer had complete control of the circumstances. Mr. Romero was in the patrol car at night with his hands handcuffed behind him. He was at the mercy of the officers with no ability to make notes or otherwise make a record of what was said or not said regarding consent. There was no one else he could call over to witness the conversation. The same officer who testified that Mr. Romero gave consent also testified untruthfully that he saw cocaine in a clear plastic bag when he lifted shirts from Mr. Romero's closet and testified untruthfully that he did not have difficulty communicating with Mr. Romero. In such a case, the Government should be held to a higher standard of proof in establishing consent to search a person's home.

## II. Any Consent Was Not Voluntary

Under the federal totality of circumstances test described in United States v. Sawyer, 441 F.3d 890 (10th Cir. 2006), any consent by Mr. Romero was not

voluntary. It is undisputed that Mr. Romero was arrested at gun point from behind bushes a few blocks from his home. (R.O.A. Vol. II, pp. 57-58). It is undisputed that he remained in custody from that point through the confrontation at his home and transport to the jail. (R.O.A. Vol. II, pp. 22-24, 27-30, 32, and 38-39). It is undisputed that at the time of the confrontation and alleged consent outside his home, he was in the back seat of the patrol car with his hands handcuffed behind him. (R.O.A. Vol. II, pp. 29-30). It is undisputed that at the time of the confrontation and alleged consent, that at least five police officers were on the scene. (R.O.A. Vol. II, p. 39-40). It is undisputed that immediately prior to the alleged consent, Officer Boone repeatedly asked Mr. Romero for his correct name and at least once threatened Mr. Romero with new charges if he did not provide his real name. (R.O.A. Vol. II, pp. 24-25). It is undisputed that the officers brought Ms. Montoya out to the car and she identified Mr. Romero as Anthony Romero. (R.O.A. Vol. II, p. 25). It is undisputed that Officer Boone testified under direct examination:

> Q. What, if anything, was done then at that time to try to ascertain his true identity?
>
> A. I then asked if it was not him, if he had any ID inside the residence which would make us believe that he was not Anthony.
>
> Q. What did he tell you?
>
> A. He stated that he believed that he had some inside, maybe just inside by a door inside of the residence.

(R.O.A. Vol. II, p. 16) and on cross-examination:

> Q. Officer Espinoza told him that he needed to look for his identification?
>
> A. No. He was adamant he was not this Anthony person and wanted to prove that he was not Anthony. He stated that he had some ID inside the house that would prove him not to be Anthony Romero.

(R.O.A. Vol. II, p. 30).

It is undisputed that Sgt. Espinoza knew Anthony Romero. (R.O.A. Vol. II, p. 61 and 65-66). It is undisputed that once Ms. Montoya identified Mr. Romero as Anthony Romero that Officer Boone placed him in handcuffs based upon her identification and the two outstanding warrants disclosed in the police computer system. (R.O.A. Vol. II, pp. 25-26). It is undisputed that after Mr. Romero allegedly gave the officers consent to search, Officer Boone took Mr. Romero to jail. (R.O.A. Vol. II, p. 32). It is undisputed that Sgt. Espinoza used trickery to persuade Mr. Romero to give consent. (R.O.A. Vol. II, p. 62). It is undisputed that Sgt. Espinoza knew Mr. Romero's identity and because he knew who he was, wanted to search the house for drugs. (R.O.A. Vol. II, pp. 65-67). Finally, despite the Government's argument to the contrary (Appellee Br. at p. 14), it cannot reasonably be disputed that Sgt. Espinoza had difficulty communicating with Mr. Romero. (R.O.A. Vol. II, pp. 72-73).[2]

---

[2] Aplt. App. #1 provides an opportunity to observe Mr. Romero communicating with another officer during an interrogation. While Mr. Romero can speak English, it is clear that it is difficult to understand him and that he does not always understand what is being said - consistent with someone who proud of his ability to speak English and not willing to admit his weaknesses in understanding or communicating.

Considering all these facts, the totality of the circumstances demonstrate the presence of duress, threats, deception, trickery, the presence of several officers, being handcuffed in the back of the police car, the display of the police firearm and the difficulty in communication which all combined to establish that any consent was not the product of a free and voluntary consent.

The Government argues the District Court was correct and reasserts the District Court findings. However, as set forth above, the critical findings are not disputed. Those facts, as a matter of law, fail to establish that the consent was voluntary under Sawyer and the line of cases referenced in Appellant's Brief.

**III. The Search Was Outside the Scope of Any Consent**

The Government and the Defendant agree that "[t]he scope of a consent to search 'is generally defined by its expressed object, and is limited by the breadth of the consent given.'" United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998) quoting from United States v. Elliott, 107 F.3d 810, 814-15 (10th Cir. 1997). It is undisputed that the object of the search and the breadth of the consent given was limited to establishing who Mr. Romero was. The problem, of course, was that Sgt. Espinoza already knew who Mr. Romero was. Officer Izzard told Sgt. Espinoza that Ms. Montoya identified Mr. Romero (R.O.A. Vol. II, p. 39), and Ms. Montoya told Sgt. Espinoza who Mr. Romero was when they were together in the house (R.O.A. Vol. II, p. 61), Ms. Montoya went out to the car, looked through the car windows, and told the officers standing around, including Sgt. Espinoza, that he was Anthony Romero

(R.O.A. Vol. II, pp. 39-40). Officer Boone placed Mr. Romero in handcuffs to transport him to jail because the police computers showed warrants for Anthony Romero. (R.O.A. Vol. II, pp. 25-26, 30-32, and 66-67). At the jail, before the officers searched the house, Officer Boone confirmed from booking pictures that Mr. Romero was Anthony Romero (R.O.A. Vol. II, pp. 27-28 and 65-66).

Since Sgt. Espinoza already knew the identity of Mr. Romero, there was no reason to search for his identification. The object and defined breadth of the search was satisfied, even before the search began. Sgt. Espinoza knew Mr. Romero's identity and was using pressure by Officer Boone to have Mr. Romero prove up his identity as an excuse to search for drugs in the closet. It worked. Officer Boone convinced Mr. Romero that he had to prove who he was and Sgt. Espinoza tricked Mr. Romero into believing that Sgt. Espinoza would help Mr. Romero by looking for his identification. In addition to creating a situation which is anything but a voluntary and free consent, it was also far beyond the scope of the consent. Once Sgt. Espinoza knew who Mr. Romero was, then there was no longer any consent to search. If consent was given, It was not reasonable for Mr. Romero to expect that Sgt. Espinoza's search would continue once Sgt. Espinoza knew who Mr. Romero was.

Second, again, the scope of a search is measured by objective reasonableness - what a reasonable person would understand the scope of the search to be. Id. at 1367-1368. Sgt. Espinoza testified that he carefully went

through Mr. Romero's shirts stacked on the top shelf of his closet. (R.O.A. Vol. II, p. 65). He did not want to unfold everything and wanted to keep things as nice as he could. (R.O.A. Vol. II, p. 65). Sgt. Espinoza was looking for drugs. (R.O.A. Vol. II, p. 65). It may have been reasonable to look for drugs under the neatly folded shirts, but it was not reasonable to look for identification among the shirts. Again, one would not look for identification in clothes which had been washed and neatly folded in the closet as opposed to recently worn clothes hanging on a door knob or lying on the floor. In addition, the scope of Sgt. Espinoza's search was limited to identification. It was not reasonable to expect to find identification in a white shopping bag wrapped around another package found hidden between stacked folded shirts. What was reasonable was that the bag contained something else which the subject did not want to be found.

The Government's response is limited to the argument that the scope of the search issue was not preserved. It was clearly presented in the Defendant's brief and ruled upon by the Court.

Moreover, as is clear from the cross-examination during the suppression hearing, counsel was not provided with statements by the Government's witnesses until after they testified. (R.O.A. Vol. II, pp. 18, 37, and 55). That is standard practice for the Assistant United States Attorney who handled the trial of the case. Therefore, the motion and brief was prepared with a minimal amount of information. However, during the direct and cross-examination, additional information was

disclosed which focused the issues and the consistent point of cross-examination of the Government's witnesses was the fact that Sgt. Espinoza already knew who Mr. Romero was. This fact supported the argument that Sgt. Espinoza tricked Mr. Romero into giving consent, if he did, and that Sgt. Espinoza exceeded the scope of the consent, if any. Most respectfully, despite the evidence to the contrary, the District Court found that Sgt. Espinoza "wanted and intended to search for identification." (R.O.A. Vol. I, No. 25, p. 8). The District Court found that Sgt. Espinoza was justified in looking in any items in the closet which might contain identification. (R.O.A. Vol. I, No. 25, p. 10). There is no question that the Court held that, notwithstanding the evidence that Sgt. Espinoza knew who Mr. Romero was, Sgt. Espinoza was genuinely trying to honor the scope of the search - find out who Mr. Romero was by searching for his identification. Most respectfully, the District Court erred - the search exceed the scope and breadth of the reason for the search because as the evidence amply demonstrated, Sgt. Espinoza already knew Mr. Romero's identity, there was no reason to search for identity and Sgt. Espinoza exceeded the scope and breadth of the consent, if any.

The Government's sole argument fails to account for the limited information available prior to the evidentiary hearing, the issues raised through cross examination of the government witnesses and the fact that the issues were presented and addressed by the Court.

## CONCLUSION

The Defendant respectfully asks that this Court reverse the District Court's decision denying the Defendant's Motion to Suppress. Mr. Romero did not consent to the search of his closet, any consent was not voluntary and the search exceeded the scope of any consent.

____________________________________
JOHN K. HENDERSON, JR.

s/John K. Henderson, Jr.
JOHN K. HENDERSON, JR.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Reply Brief of Appellant was duly mailed (Federal Express) and an electronic submission provided in digital format was sent via e-mail to the following on this 5th day of October, 2006, to: Original and 7 copies and email submission to:

Ms. Elisabeth Shumaker
Clerk of the Court
Tenth Circuit Court of Appeals
1823 Stout Street
The Byron White U.S. Courthouse
Denver, Co 80257

two copies hand delivered and email copy to:
Brent I. Anderson
Assistant U.S. Attorney
301 N. Main, Suite 1200
Wichita, KS 67202

one copy mailed to:
Anthony R. Romero, Reg. No. 19267-031
c/o FCI OAKDALE
P.O. Box 5000
Oakdale, LA 71463

JOHN K. HENDERSON, JR.

s/John K. Henderson, Jr.
JOHN K. HENDERSON, JR.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org

**CERTIFICATE OF DIGITAL SUBMISSION**

I certify the following:

1. All required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk, and

2. The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec AntiVirus Corporate Edition, Program Versions 8.1.0.825, updated 10/4/2006 rev.9, and, according to the program, are free of viruses.

______________________________
JOHN K. HENDERSON, JR.

s/John K. Henderson, Jr.
JOHN K. HENDERSON, JR.
Sup. Ct. No. 19022
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
E-mail: John_Henderson@fd.org